RONALD M. ARLAS, ESQ. #59091
ARLAS & SMITHTON
100 Wood Hollow Drive
Novato, CA 94945
(415) 878-5390
Fax (415) 878-3595
Email: ron.arlas@greenpoint.com

EDWARD R. BUELL, ESQ. #240494
GREENPOINT MORTGAGE FUNDING, INC.
100 Wood Hollow Drive
Novato, Ca. 94945
(415) 878-5616
Fax (4150 878-3593
Email: ted.buell@greenpoint.com

Attorneys for Defendant
CAPITAL ONE SERVICES

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARIM A. ALLAN,<br><br>        Plaintiff,<br><br>vs.<br><br>CORPORATION SERVICE COMPANY, et al.<br><br>        Defendants. | Case No. 3:08-CV-01534-ECM<br><br>[Assigned for all purposes to Judge Edward M. Chen]<br><br>REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF CAPITAL ONE SERVICES' MOTION TO DISMISS THE COMPLAINT [FRCP §12(b)(6)]<br><br>Date:       July 9, 2008<br>Time:     10:30 a.m.<br>Courtroom:  C (15th Floor) |

Defendant CAPITAL ONE SERVICES ("CAPITAL") by and through its attorney, hereby

requests the Court to take judicial notice pursuant to Federal Rule of Evidence 201 of the following

facts, documents and evidence:

1.    A copy of the Final Settlement Statement or HUD-1 dated December 14, 2006 for Plaintiff's loan that is the subject of this litigation a copy of which has been attached hereto as Exhibit 1.  This exhibit will complete Exhibit A to Plaintiff's Complaint wherein Plaintiff attached an incomplete copy of the preliminary HUD-1 dated November 30, 2006.

2.    The full copy of the escrow instructions from the "Lender" for Plaintiff's loan that is the subject of this litigation a copy of which has been attached hereto as Exhibit 2.  This exhibit will complete Exhibit B to Plaintiff's Complaint wherein Plaintiff did not attach a complete copy of the escrow instructions.

3.    A copy of the Promissory Note for Plaintiff's first loan that is the subject of this litigation a copy of which has been attached hereto as Exhibit 3.

4.    A copy of the Deed of Trust for Plaintiff's first loan that is the subject of this litigation a copy of which has been attached hereto as Exhibit 4.

Dated: May 14, 2008                    ____/s/ Ronald M. Arlas_____
                                       RONALD M. ARLAS, ESQ.
                                       Attorney for Defendant
                                       CAPITAL ONE SERVICES

\Legal\PLEADING\Allan v Gil, GPM\Cap One Request for Judicial Notice 5.08.doc

# EXHIBIT 1

**A. SETTLEMENT STATEMENT** U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

| B. Type of Loan | | | OMB No. 2502 0265 |
|---|---|---|---|
| 1. []FHA 2. []FmHA 3. [X]Conv. Unins. 4. []VA 5. []Conv. Ins. | 6. File Number 54613-56240984-RGP  Map No. 10 Shore View Tract | 7. Loan Number 0203206180 | Mortgage Insurance Number |

C. Note:  THIS NOTE IS FURNISHED TO GIVE YOU A STATEMENT OF THE ACTUAL SETTLEMENT COSTS. AMOUNTS PAID TO ANY AND BY THE SETTLEMENT AGENT ARE SHOWN. ITEMS MARKED "(P.O.C.)" WERE PAID OUTSIDE OF THE CLOSING. THEY ARE SHOWN HERE FOR INFORMATION PURPOSES AND ARE NOT INCLUDED IN THE TOTALS.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| Karim Allan  1719 Kehoe Avenue San Mateo, CA | | Greenpoint Mortgage Funding, Inc. 100 Wood Hollow Drive Novato, CA 94945 |

| G. PROPERTY LOCATION | H. Settlement Agent | |
|---|---|---|
| 1719 Kehoe Avenue San Mateo, CA | North American Title Company | |
| | Place of Settlement | FINAL |
| | 39488 Stevenson Place, #109 Fremont, CA 94539 | Settlement Date December 14, 2006 |

*CERTIFIED TO BE A TRUE AND CORRECT COPY ... North American Title Company*

| J. SUMMARY OF BORROWER'S TRANSACTIONS | | K. SUMMARY OF SELLER'S TRANSACTIONS | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract Sales Price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal property | |
| 103. Settl. Chrgs. to Borrower (line 1400) | 9,772.00 | 403. | |
| 104. Homecomings Financial | 560,313.23 | 404. | |
| 105. Wells Fargo | 141,054.90 | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/Town Taxes | | 406. City/Town taxes | |
| 107. County Taxes | | 407. County taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 120. Gross Amount Due From Borrower | 711,140.13 | 420. Gross Amount Due to Seller | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposits or Earnest Money | | 501. Excess deposit (see instructions) | |
| 202. New 1st Trust Deed | 540,000.00 | 502. Settl. chrgs. to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Interest at $17.5300/day from 12/13/2006 to 12/01/2006 from Greenpoint Mortgage Funding, Inc. | 210.36 | 504. | |
| 205. New 2nd Trust Deed | 80,000.00 | 505. | |
| 206. Interest at $21.3700/day from 12/13/2006 to 12/01/2006 from Greenpoint Mortgage Funding, Inc. | 256.44 | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/Town taxes | | 510. City/Town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 720,466.80 | 520. Total Reductions in Amount Due Seller | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT FROM/TO SELLER** | |
| 301. Gross Amounts due from Borrower (line 120) | 711,140.13 | 601. Gross amount due to Seller (line 420) | |
| 302. Less amounts paid by/for Borrower (line 220) | 720,466.80 | 602. Less reductions in amount due Seller (line 520) | |
| 303. CASH TO BORROWER | 9,326.67 | 603. CASH FROM SELLER | |

| L. SETTLEMENT STATEMENT | | |
|---|---|---|
| **700. TOTAL SALES/BROKER'S COMMISSION** | **PAID FROM BORROWER'S FUNDS AT SETTLEMENT** | **PAID FROM SELLER'S FUNDS AT SETTLEMENT** |
| Based on price $    @    % | | |
| 701. | | |
| 702. | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee to Ameriwest Funding | 3,200.00 | |
| 802. Loan discount | | |
| 803. Appraisal fee | | |
| 804. Credit report | | |
| 805. Lender's inspection fee | | |
| 806. Mortgage insurance application fee | | |
| 807. Assumption fee | | |
| 808. Tax Service to Greenpoint Mortgage Funding, Inc. | 79.00 | |
| 809. Document Fee to Greenpoint Mortgage Funding, Inc. | 390.00 | |
| 810. Underwriting Fee to Greenpoint Mortgage Funding, Inc. | 250.00 | |
| 811. Additl. Items See Page #3 | 3,146.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest | | |
| 902. Mortgage insurance | | |
| 903. Hazard Insurance | | |
| 904. Flood Insurance | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard Insurance | | |
| 1002. Mortgage insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes | | |
| 1005. Annual assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Reserves | | |
| 1009. | | |
| **1100. ESCROW AND TITLE CHARGES** | | |
| 1101. Escrow Fee to North American Title Company | 574.00 | |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title insurance binder | | |
| 1105. Document Preparation Fee to North American Title Company | 100.00 | |
| 1106. Notary fees | | |
| 1107. Attorney's fees | | |
| 1108. Title Insurance to North American Title Company | 1,523.00 | |
| 1109. Lender's coverage $704,000.00 $1,401.00, Lender's $80,000.00 $122.00 | | |
| 1110. Owner's coverage $ | | |
| 1111. 1st Lender Endorsements 103.3 to North American Title Company | 25.00 | |
| 1112. Domestic Wire Fee to North American Title Company | 25.00 | |
| 1113. Additl. Items See Page #3 | 180.00 | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording fees: Deed $; Mortgage $80.00; Mortgage $ to North American Title Company | 80.00 | |
| 1202. City/County tax stamps | | |
| 1203. State tax/stamps | | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey | | |
| 1302. Pest Inspection | | |
| 1303. Current Taxes 1st intatll 2006-07  POC $4,084.14 to San Mateo County Tax Collector | | |
| 1304. Jason Park for notary services | 200.00 | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| **1400. TOTAL SETTLEMENT CHARGES (ENTER ON LINES 103 SECTION J AND 502 SECTION K)** | 9,772.00 | |

The items which were paid outside of closing are indicated by "POC" and have been included at the direction of the lender for disclosure purposes only.  The escrow holder/settlement agent herein has no knowledge of these expenditures, except as provided by lender.  They have not been and cannot be verified as to the amount, the payee, nor actual payment and no liability is assumed by the closing agent as to the validity and/or sufficiency thereof.  *Recording Fees include charges for services performed by North American Title Company, Inc., in addition to an estimate of payments to be made to governmental agencies.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused the funds to be disbursed in accordance with this statement.

12.14.06

_____     _____
Settlement Agent                            Date

PAYOFF BREAKDOWN(S)
  Payoff to Homecomings Financial
  TOTAL $560,313.23 .

| | |
|---|---:|
| Principal Balance | 556,000.00 |
| Interest on Principal Balance to 12/12/2006 | 3,634.47 |
| Interest on Principal Balance at $85.6800/day from 12/13/2006 to 12/20/2006 | 599.76 |
| Demand/Statement Fee | 30.00 |
| Reconveyance Fee | 30.00 |
| Wire Fee | 5.00 |
| Recording Fee(s) | 14.00 |

  Payoff to Wells Fargo
  TOTAL $141,054.90

| | |
|---|---:|
| Principal Balance | 137,977.10 |
| Interest on Principal Balance to 11/27/2006 | 2,187.03 |
| Interest on Principal Balance at $38.3700/day from 11/28/2006 to 12/19/2006 | 805.77 |
| Demand/Statement Fee | 30.00 |
| Reconveyance Fee | 45.00 |
| Fax Fee(s) | 10.00 |

**ADDITIONAL ITEMS PAYABLE IN CONNECTION WITH LOAN**

| | BORROWER | SELLER |
|---|---:|---|
| Flood Cert Fee to Greenpoint Mortgage Funding, Inc. | 11.00 | |
| Yield Spread Premium  POC $19,200.00 to Ameriwest Funding | | |
| Review Appraisal Fee to Greenpoint Mortgage Funding, Inc. | 200.00 | |
| Process/ Admin fee to Broker to Ameriwest Funding | 2,785.00 | |
| Funding Fee to Greenpoint Mortgage Funding, Inc. | 150.00 | |
|     Total to line 811 | 3,146.00 | |

**ADDITIONAL ESCROW AND TITLE CHARGES**

| | BORROWER | SELLER |
|---|---:|---|
| Courier/Overnight Fee to North American Title Company | 80.00 | |
| EDocs Processing Fee to North American Title Company | 100.00 | |
|     Total to line 1113 | 180.00 | |

# EXHIBIT 2

# LENDER'S CLOSING INSTRUCTIONS

## CLOSING INFORMATION

| | | | |
|---|---|---|---|
| Lender Name: | GreenPoint Mortgage Funding, Inc. | Date: | 11/30/2006 |
| Lender Address: | 100 Wood Hollow Drive, Novato, CA 94945 | Phone Number: | 800-462-2700 |
| | | Fax Number: | 415-878-3589 |
| Lender Contact: | | | |
| | Jaylene Robles | | |
| Escrow Company: | NORTH AMERICAN TITLE COMPANY | Title Company: | NORTH AMERICAN TITLE COMPANY |
| Address: | 39488 STEVENSON PLACE, #109 | Address: | 39488 STEVENSON PLACE, #109 |
| | FREMONT, CA 94539 | | FREMONT, CA 94539 |
| Attn: | NORTH AMERICAN TITLE COMPANY | Officer: | NORTH AMERICAN TITLE COMPANY |
| Phone Number: | 510-505-0811 | Phone Number: | 510-505-0811 |
| Fax Number: | 510-505-0375 | Fax Number: | 510-505-0375 |
| Escrow Number: | 54613-56240984-RGP | Order Number: | 55912-56110677-DMW |

## LOAN / BORROWER / PROPERTY INFORMATION

Borrower(s):  Karim Allan

| | | | |
|---|---|---|---|
| | | Loan #: | 0203206180 |
| | | Case #: | |
| | | Closing Date: | 11/30/2006 |
| | | Disbursement Date: | TBD |
| Property Address: | 1719 Kehoe Avenue | Note Amount: | 640,000.00   Term: 360 |
| | | Base Loan Amount: | 640,000.00 |
| City, State, Zip: | San Mateo, CA 94401 | Interest Rate: 1.000   Expires: 12/20/2006 |
| | | HELOC Doc Expiration Date: | N/A |
| County: | San Mateo | | |
| | | CLOSED-END LOANS ONLY | |
| Property Type: | Single Family Detached | (Info not currently available for HELOCs): | |
| | | First Pay Date: | 01/01/2007 |
| Occupancy Type: | Primary Residence | | |
| | | Maturity Date: | 12/01/2036 |
| Loan Purpose: | Refi – Rate and Term | | |
| | | MONTHLY PAYMENT: | |
| | | P & I: | 2,058.49 |
| Sales Price: | 0.00 | Taxes: | |
| | | City: | 0.00 |
| Appraised Value: | 800,000.00 | County: | 0.00 |
| | | Haz. Ins.: | 0.00 |
| Lender Approved | | Flood Ins.: | 0.00 |
| Subordinate Financing: | 80,000.00 | MI: | 0.00 |
| | | Escrow Annual Assessment: | 0.00 |
| | | Other Impound 1: | 0.00 |
| | | Other Impound 2: | 0.00 |
| | | | |
| | | TOTAL: | 2,058.49 |

TABLE OF CONTENTS:

LENDER'S FUNDING REQUIREMENTS ................................................................. 2
FAXING AND DELIVERY INSTRUCTIONS............................................................ 2
REQUIRED TERMS AND CONDITIONS................................................................ 2
SETTLEMENT CHARGES....................................................................................... 3
LENDER CHARGES AND PREPARATION OF HUD-1......................................... 3
DOCUMENT EXECUTION ROUIREMENTS.......................................................... 4
SPECIFIC LOAN/TITLE POLICY REQUIREMENTS.............................................. 5
SUPPLEMENTAL LOAN/TITLE POLICY REQUIREMENTS................................. 5
TITLE INSURANCE REQUIREMENTS................................................................... 5
TAXES...................................................................................................................... 6
MANDATORY TRANSACTION DOCUMENTS........................................................ 7
CUSTOMER IDENTIFICATION PROCEDURES AND FRAUD/MONEY LAUNDERING PREVENTION......7
INFORMATION SECURITY.................................................................................... 7
COMPLIANCE REQUIREMENTS........................................................................... 7
ACKNOWLEDGMENTS........................................................................................... 8

## LENDER'S FUNDING REQUIREMENTS

- All documents and conditions of funding must be timely delivered to the Lender's office indicated on these Lender's Instructions. All funds are issued in check or wire form. If wire is selected, it is the sole responsibility of the receiving bank to advise of receipt of funds. If funding by check, funds are not to be deposited prior to actual disbursement date.

- Your request for funds (whether verbal or written) establishes that you are in a position to close the transaction. Hence, you will be responsible for daily interest from that day forward, in the event the transaction does not close and Lender has disbursed loan proceeds.

- If you are aware that the loan proceeds will not be disbursed by the first business day after you receive loan funds from the Lender, or you are unable to record the security instrument by the first business day following receipt of loan funds from the Lender, you are responsible for contacting the Lender and returning the loan proceeds. You will be responsible for daily interest on the entire original principal balance of the loan from date of disbursement by the Lender. If this loan is a Home Equity Line of Credit (HELOC), you will be responsible for daily interest on the principal balance distributed from the credit line from date of disbursement by Lender.

- Two certified copies of Borrower's and Seller's Settlement Statement must be forwarded within 24 hours after recordation.

## FAXING AND DELIVERY INSTRUCTIONS

**Wet-funds states delivery:**
1. Fax preliminary HUD-1 or preliminary closing statement to branch for approval prior to disbursing funds.
2. Within 48 hours of closing, return the signed closing package (including the final HUD-1) to the closing branch at this address

   N/A

**Dry-funds states delivery:**
1. Fax each final HUD-1 individually to GPM's Post Closing Department at 415-878-0015
2. Within 48 hours of signing, return the signed closing package to the closing branch at this address:

   **GreenPoint Mtg East Bay**
   **100 Wood Hollow Drive**
   **Novato, CA 94945**

## REQUIRED TERMS AND CONDITIONS

0: Notice of Right to Cancel to be completed with rescission dates, by escrow, once closing date is determined.
0: "Title Insurance to be issued for 110% of the loan amount due to Negative Amortization"
0: Settlement/Escrow fees disclosed as $624.00 If any fees change, contact your Lender contact as indicated IN Lenders Closing Instructions.
0: Closing Agent to attach certified legal description to Deed of Trust.
16002: Concurrent funding with loan # 0203206289.
15019: Copy of 2nd Mortgage Note with terms acceptable to GPMF.
14000: GPM to conduct a verbal verification of borrower's current employment.
15000: Evidence that the following debt(s) have been paid in full: homecoming $556k and wells fargo 2nd for $137977
11007: Refinances - Required closing costs and payoffs not to exceed $703677. Actual closing costs and payoffs shown on the estimated HUD 1 exceeding this amount will require Underwriter approval.
16000: No cash out: amount not to exceed the lesser of $2,000.00 or 2%. Any amount over to be applied to principal balance.
16009: Evidence of Flood Insurance.
11001: VODs for Wells Fargo must be computer generated***need computed generated copy of Wells Fargo Vod w/current balance of $37091 as of 11/22/06 due to VOD in file is handwritten.****

## SETTLEMENT CHARGES

*No changes to fees are allowed without our written approval. Final settlement fees must comply with applicable federal laws, rules, and regulations; and any applicable state laws or local ordinances.

| FEES | BUYER PD | SELLER PD | BROKER PD | LENDER PD | POC |
|------|----------|-----------|-----------|-----------|-----|
| Origination Fee to Broker * | $3,200.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Yield Spread Premium | $0.00 | $0.00 | $0.00 | $19,200.00 | $0.00 |
| Doc Prep Fee To GPM* | $390.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Tax Service Fee* | $79.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Review Appraisal Fee* | $200.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Process/Admin Fee to Broker* | $2,785.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Flood Certification Fee* | $11.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Underwriting Fee to GPM* | $250.00 | $0.00 | $0.00 | $0.00 | $0.00 |

Lender Paid Mortgage Taxes:    0.00
Total Fees Paid From Rebate:    N/A

| RESERVES: | | | | BUYER | SELLER |
|-----------|---|---|---|-------|--------|
| Hazard Insurance | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Mortgage Insurance | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Flood Insurance | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| City Taxes | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| County Taxes | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Annual Assessments | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Other Impound 1: | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Other Impound 2: | 0 | month @ $ 0.00 | /month | 0.00 | 0.00 |
| Aggregate Adjustment | | | | 0.00 | 0.00 |

** Please be aware that impounds are an estimate.

### PREPAID INTEREST:

FROM: 12/05/2006    TO: 12/01/2006    =-4    days    @$ 17.53    / day = -70.12

WIRE/CHECK AMOUNT (available for wet-funds states only):    N/A

---

### LENDER CHARGES AND PREPARATION OF HUD-1

- Lender's (and other third-party) fees are indicated in the "Settlement Charges" section of these instructions. These charges are to be reflected precisely as labeled on the appropriate line of HUD-1. POC items must be reflected as such on HUD-1.

- Preliminary HUD-1 or preliminary closing statement must be reviewed and approved by closer/funder prior to closing.

- You have disclosed to us the loan settlement fees to be charged on this loan via the preliminary HUD-1 or preliminary closing statement. No changes to these fees are allowed without our written approval. If additional fees are charged without our approval, you will be required to refund the additional fees to the borrower. In addition to refunding the unapproved fees, you will be required to pay for any and all damages incurred by the Lender, borrower and seller as a result of your failure to follow any of these closing instructions.

- We require a final HUD-1 or HUD-1A RESPA Settlement Statement on all transactions. We rely solely upon the escrow agent to complete and deliver the "Statement of Actual Costs" in accordance with the Real Estate Settlement Procedures Act. A condition of our loan is that the escrow agent and title company accept all conditions set forth on this document and on the other pages and addenda of these instructions. The "Statement of Actual Costs" must be complete and delivered in accordance with such requirements in order that we are not subject to any claim for, or any damage, liability or penalty.

- All HUD-1's must clearly distinguish those costs associated with any Lender-approved secondary financing from those required by this loan.

- Separate HUD-1 Settlement Statements must be completed for any Lender-approved secondary financing.

- No transaction may close with funds escrowed for completion of improvements without Lender's written consent and instruction. Lender must review and approve estimated settlement statement prior to close.

- HUD-1 must either be signed by the Borrower or certified by the settlement agent. Applies to Final HUD-1 and estimated HUD-1 (or preliminary closing statement).

- No credits from seller or third parties are permitted unless specifically authorized by Lender (including credits for work to be done at a later date).

- "Interest credit" is allowed to the 8th of the month for conventional loans, to the 7th of the month for FHA loans, and to the 10th of the month for VA loans.

- The total consideration in this transaction, except for our loan and any Lender-approved secondary financing, must pass through your escrow in the form of cash. Lender must approve any "equity" considerations.

- All government-insured loans must be closed in accordance with FHA/VA regulations concerning authorized charges to the borrower. If you have any questions regarding acceptability of any proposed borrower charges, please contact the Lender before closing.

- **If you do not accept these conditions, return these instructions immediately, together with all documents enclosed, to Lender at address given under Closing Information (page 1) - do not close this transaction! Your acceptance of funds will be deemed acceptance of and agreement to comply with all conditions set forth.**

## DOCUMENT EXECUTION REQUIREMENTS

### SIGNATURES:
- All documents must be executed precisely as drawn. Do not change or alter any documents, with the exception of completing the borrower name and social security number portions on the Request for Copy of Tax IRS form 4506 and Tax Information Authorization 8821. Any change or alterations will necessitate the drawing of a new set of documents for signature.
- If spouse is not named as obligor, you must obtain the necessary signatures and documents to perfect our lien. (If we have indicated obligor is not married and you determine otherwise, you must notify us prior to closing.)

### NOTARY FORMS:
- "Acknowledgment" and "Jurat" forms are acceptable. Subscribing witness form is not acceptable. Additionally, the form must bear stamp/seal, expiration date, acknowledgment date, printed name and signature of notary.
- Lender does not permit a real estate sales individual or loan broker with an interest in the transaction to acknowledge execution of the documents.
- If these loan documents are to be executed in a foreign country, you must meet acknowledgement requirements established by the county recorder's office in which the subject property is located.

### POWER OF ATTORNEY:
- Lender must approve the execution of loan documents with Power of Attorney and it must be a Special/Specific POA.
- If Lender approves the execution by Power of Attorney, Lender will require that, at minimum, the form grants the authority to purchase and encumber real estate and names the subject property. Lender may approve such execution subject to other conditions.
- All closing documents must be signed by attorney-in-fact (in his/her own handwriting) spelled out as follows with no abbreviations: "[name of borrower] by [name of attorney-in-fact], [his or her] attorney in fact."
  Closing Agent to provide two certified copies of Power of Attorney.

### CORRECTIONS TO DOCUMENTS & FEES:
- Any change or correction to Lender's loan documents must be prior-approved by Lender.
- Any approved changes must be made with a typewritten slash-through (//), (not handwritten), and initiated by all borrowers. White-out/erasure is not permitted for correction or alteration of any loan document.

### APPROPRIATE DOCUMENTS (PROPERTY TYPE):
- Lender's documents assume the property type reflected on page 1 of these instructions (single family detached, PUD, condominium, etc.).
- Should you determine that the security is not of the type indicated, contact Lender prior to settlement.

### RIGHT TO RESCIND DOCUMENTS (if applicable):
- All parties who have an ownership interest in the subject property must receive two completed copies of the notice of Right to Cancel form.
- Because no corrections or whiteouts are permitted on the form, you may want to contact Lender to confirm the expiration date.

### PRINTING DOCUMENTS:
- All documents must be printed on white bond paper with a minimum weight of 20 lbs.
- Any document not printed on white bond paper will be returned, and funding of the loan will be delayed.

### COPIES OF DOCUMENTS TO BORROWERS:
- Closing agent is responsible for providing borrowers with copies of all closing documents upon close of escrow.

## SPECIFIC LOAN/TITLE POLICY REQUIREMENTS

Lender has reviewed the Preliminary Title Report/Commitment/Interim Title Binder on subject property dated 10/20/2006 and approves it subject to the following:

| Cleared: | 5,6- OUT |
|---|---|
| Approved: | 1,2 Paid Current 3 (100.12) 4 (103.3) |

Additionally, Lender requires the following endorsements:

| Required by Property Type | Required by Loan Type |
|---|---|
| CLTA100, CLTA110.9, CLTA116, CLTA103.3 | CLTA111.8 |
| **Other Endorsements** | **Other Endorsements** |
| CLTA100.12 | |

Lender expects that you will issue (or request issuance of) the title policy within 30 days of closing and requests that it be forwarded to the following address:

Document Control
GreenPoint Mortgage Funding, Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049

## SUPPLEMENTAL LOAN/TITLE POLICY REQUIREMENTS

**Lender requires a title insurance policy for all loans closed.**

Lender requires a full ALTA policy on all first mortgages and on seconds with loan amounts exceeding $200,000. On second mortgages with loan amounts of $200,000 or less, Lender accepts a limited policy ("flag", "short", etc.) where available.

In addition, for limited policies on second mortgages, Lender requires lien verification that guarantees that we are in second lien position, subject only to a first mortgage and general and specific taxes as indicated in the Lenders Instructions. Additionally, for home equity line of credit (HELOC) second mortgages, Lender requires two endorsements: a "bring down" endorsement showing the new loan recorded and a "revolving credit rate" endorsement.

## TITLE INSURANCE REQUIREMENTS

### NAME OF INSURED:

GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, CA 94945

**Acceptable Forms:**

Lender only accepts 1992 ALTA loan title insurance policy form and earlier forms that do not include the creditor's rights exclusion language

**Acceptable Title Insurers:**

The title policy issuer must have an acceptable rating from one of the following rating agencies:

- "Financial Stability Rating" of "S" (Substantial) or better or a "Statutory Account Rating" of "C" (Average) or better from Demotech, Inc.;

- "BBB" or better rating from Duff and Phelps Credit Rating Company;

- "C" or better rating from LACE Financial Corporation;

- "Baa" or better rating from Moody's Investor's Service;

- "BBB" or better rating from Standard Poor's Inc;

- Title insurer who does not meet one of these requirements but it is fully covered by reinsurance with a company that does meet one of these rating requirements AND both entities are licensed to issue title insurance in the state where the property is located, are in good standing with the state's insurance regulator and execute an Assumption of Liability Endorsement (Form 858).

### Schedule A Issues

- **Effective Date of Coverage:** The effective date of title insurance coverage may be no earlier than the later of the date of the final disbursement of loan proceeds or the date the mortgage was recorded.

- **Acceptable Minimum Coverage:** The amount of the title insurance coverage must at least equal the original principal amount of the mortgage.

- **Negative Amortizations:** If the principal amount of the mortgage can increase due to negative amortization, the title insurance must cover 110% of the mortgage amount.

- **Title/Vesting:** Title/vesting must be identical on title policy and Lender's security instrument.

- **Estate or Interest:** The title policy must insure that the Lender's security instrument constitutes a valid FIRST lien on the mortgagor's fee simple estate (or Lender-approved leasehold) on the mortgaged premises.

- **Legal Description:** Legal description must be identical to that shown on security instrument and survey (if applicable).

### Schedule B Issues

- Lender will not accept any "Standard Exceptions" unless expressly approved by lender. If a survey is commonly required to remove exceptions to survey matters:
  - It may be no more than 90 days old as of the date of closing;
  - 2 original copies of survey must be provided;
  - It must be staked and certified by a licensed and bonded Public Surveyor or a State Licensed Engineer;
  - It must show dimensions, directions, location of improvements, easements, encroachments, setback lines, beginning point, relation to adjacent properties and street intersections, northpoint, access, legal description, street address and flood map location;
  - It must be signed, dated and embossed with surveyor's seal.

*Note:*
  - For condominium properties, a copy of the recorded map showing location of the unit will be required in lieu of survey.

  - If surveys are not commonly required in a particular jurisdiction, lender requires that title policy include ALTA endorsement 9 (or its equivalent) and street address endorsement. If neither survey not referenced endorsements are customary, the title policy may NOT contain a survey exception

- Title policy cannot take exception to any taxes other than those, which are not yet due and payable.
- Title policy must ensure that covenants, conditions, and restrictions contain a mortgagee protection clause and no reversionary rights. Lender will require affirmative coverage.
- Lender requires one copy of all recorded documents excepted in title policy.

| TAXES |
|---|
| General and Specific Taxes for **1st Inst 06/07** must be fully paid. Unless otherwise stated in these Instructions, ALL TAXES that are assessed against the property described herein (whether real or personal) MUST BE PAID CURRENT. |

## MANDATORY TRANSACTION DOCUMENTS

Transaction documents settlement agent must provide:

- Certified copy of your estimated settlement statement.
- Certified copy of your escrow instructions, pre-closing statement, and/or amendments.
- Original evidence of hazard insurance payment (including flood insurance, if applicable).
- Certified copy of any executed grant deed, quitclaim deed, or other transfer or relinquishment document.
- 2 certified copies of any power of attorney.

## CUSTOMER INDENTIFICATION PROCEDURES AND FRAUD/MONEY LAUNDERING PREVENTION

To comply with the U.S. Patriot Act, the Bank Secrecy Act, and regulations promulgated by the Secretary of the Treasury, Lender has established a customer identification program. The reason for this program is to obtain legally required identifying information prior to the loan closing and verify the borrower's, and any signatory's, true identity. To this end, and because you, the settlement agent, has face-to-face contact with the borrower, perform the following activities for each borrower and signatory:

(a) Explain to the borrower that information is being obtained to verify identity;

(b) verify that the borrower(s) complete the Identity Fraud Prevention Affidavit, listing their full legal name, date of birth, social security number, and driver's license, in accordance with the instructions accompanying it;

(c) for U.S. residents, confirm each borrower's identity at closing with an original, unexpired government-issued identification bearing a photo or a similar safeguard; acceptable forms of identification are (i) driver's license issued by a State or U.S. Territory, (ii) state issued non-driver identification card, (iii) foreign passport, (iv) U.S. Passport, (v) United States Military identification card;

(d) for non-U.S. residents, confirm each borrower's identity at closing with one or more of the following: an unexpired government-issued document evidencing nationality or residence and bearing a photograph; and/or an unexpired passport with passport number and country of issuance; and/or an unexpired alien identification card; acceptable forms of identification are (i) Permanent Resident Alien Card, (ii) Resident Alien Card, (iii) Employment Authorization Card, (iv) Temporary Resident Card issued by the U.S. Department of Justice;

(e) if a customer is unable to produce an unexpired form of identification, contact the Lender for assistance in independently verifying the true identity of the customer;

(f) if you cannot form a reasonable belief that the true identity of the borrower is known, suspend closing and immediately contact the Lender;

(g) include in the closing package returned to Lender copies of all identifying information provided by the borrower, copies of all documents relied on to establish the borrower's true identity or a notation on the Identity Fraud Affidavit that describes the government-issued indentification used and its number, and any documents pertaining to the resolution of any discrepancy in the identifying information obtained.

## INFORMATION SECURITY

Lender has a responsibility to our customers to keep information about them and their loan transaction strictly confidential. To that end, you must use or disclose customer information solely for the purpose of making and administrating the loan.

## COMPLIANCE REQUIREMENTS

- This loan must be closed in accordance with state and federal requirements. If you determine that you cannot comply with these instructions due to a conflict between these instructions and those requirements, please notify Lender prior to closing.

- If you discover that the terms of the transaction differ from those in the Loan/Borrower/Property Information portion of these instructions, please contact the Lender prior to closing.

- If you or any of your employees have knowledge of a concurrent or subsequent transfer or encumbrance of the subject property, you are to notify Lender prior to closing.

DO NOT CLOSE THE TRANSACTION IF:

1. To the best of your knowledge, any kickbacks, fees or consideration of any type directly or indirectly, have been paid or received in connection with this transaction, except as permitted under Section 203.7 (a)(6) of FHA regulations and administrative instructions issued pursuant thereto.

2. There are terms or conditions of sale not specified in the purchase contact or escrow instructions, which would render said contract or instructions to be untrue. All terms and agreements should be ratified by all parties and be a part of, or attached to, the purchase contract and escrow instructions.

3. There are HOLDBACKS for work to be completed, etc., unless specifically approved and provided for, in written instruction, from Lender's Closing Department.

4. There is any secondary or subordinate financing other than that specifically approved in writing by Lender whether secured or unsecured.

5. There are any cash payments not handled through escrow.

6. All Buyers' and Sellers' closing costs have not been furnished and explained to respective parties prior to close of escrow.

7. If any party attempts to tender currency at settlement/closing.

## ACKNOWLEDGMENTS

**THE UNDERSIGNED ESCROW/CLOSING AGENT ACKNOWLEDGES RECEIPT OF LENDER'S LOAN CLOSING INSTRUCTIONS AND AGREES TO COMPLY WITH THE CONDITIONS AND INSTRUCTIONS CONTAINED THEREIN.**

COMPANY:    **NORTH AMERICAN TITLE COMPANY .**

BY:

TITLE:

DATE:

(Must be acknowledged unless prohibited. If prohibited, so indicate.)

SIGNED _____

THE UNDERSIGNED BORROWER(S) ACKNOWLEDGES THAT HE/SHE HAS READ THESE INSTRUCTIONS, ACCEPTS THE CONDITIONS CONTAINED HEREIN AND AUTHORIZES LENDER TO DISBURSE LOAN PROCEEDS AS OUTLINED.

ACKNOWLEDGED AND ACCEPTED.

_____    _____ 11/30/06    _____
Karim Allan                (Borrower)   (Date)      (Borrower)        (Date)

_____    _____              _____
                           (Borrower)   (Date)      (Borrower)        (Date)

_____    _____              _____
                           (Borrower)   (Date)      (Borrower)        (Date)

_____    _____              _____
                           (Borrower)   (Date)      (Borrower)        (Date)

# EXHIBIT 3

# ADJUSTABLE RATE NOTE
## Monthly Treasury Average Index - Payment and Rate Caps

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

November 30, 2006      Fremont      California
[Date]      [City]      [State]

1719 Kehoe Avenue, San Mateon, CA 94403
[Property Address]

*CERTIFIED TO BE A TRUE COPY*
*North American Title Company*
*BY*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 640,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is GreenPoint Mortgage Funding, Inc.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of January, 2007 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than 12.000%.

### (D) Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board entitled "Selected Interest Rates (h.15)" (the "Monthly Yields").

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding three percentage points ( 3.000 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

0203206180

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.

Page 1 of 5

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **January 1, 2007**
I will make these payments every month until I have paid all the principal and interest and any other charges described below
that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to
interest before Principal. If, on **December 1, 2036**            , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363**

or

at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$2,058.49**
This amount may change.

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of
**January, 2008**            , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change
Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly
payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided
in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be
sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date
in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different
amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be
limited to an amount that will not be more than 7.5% greater than the amount of my last monthly payment due before the
Payment Change Date.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be
sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal
payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the
amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.
The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate
on the interest added to Principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to 110% of the Principal amount I originally
borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal
under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In
that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new
monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid
principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding
month.

**(G) Required Full Payment**

On **01/01/2012** and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment
as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly
payment on the final Payment Change Date.

0203206180

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10         calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        6.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

0203206180

OPTNCA-OA (06/06) GreenPoint Mortgage Funding, Inc.
Page 3 of 5

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

0203206180

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
Karim Allan                      -Borrower                                                     -Borrower

_____ (Seal)                    _____ (Seal)
                                 -Borrower                                                     -Borrower

_____ (Seal)                    _____ (Seal)
                                 -Borrower                                                     -Borrower

_____ (Seal)                    _____ (Seal)
                                 -Borrower                                                     -Borrower

*[Sign Original Only]*

0203206180

# EXHIBIT 4

RECORDING REQUESTED BY
North American Title Company

Recording Requested By:
GreenPoint Mortgage Funding,
Inc.
Return To:
GreenPoint Mortgage Funding,
Inc.
981 Airway Court, Suite E
Santa Rosa, CA 95403-2049

5591/2 56110577

Prepared By:
GreenPoint Mortgage Funding,
Inc.
100 Wood Hollow Drive,
Novato, CA 94945

56240984

**2006-188986**
NORTH AMERICAN TITLE COMPANY
08:00am 12/14/06 DT Fee: 76.00
Count of pages 24
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*  2 0 0 6 0 1 8 8 9 8 6 A R  *

—————[Space Above This Line For Recording Data]—————    24p

# DEED OF TRUST

MIN 100013802032061808

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **November 30, 2006**
together with all Riders to this document.

**(B) "Borrower"** is **Karim  Allan, An Unmarried Man**

Borrower's address is **1719 Kehoe Avenue, San Mateo, CA 94401**
. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is **GreenPoint Mortgage Funding, Inc.**

Lender is a **Corporation**
organized and existing under the laws of **the State of New York**

6180

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01

VMP -6A(CA) (0207).01
Page 1 of 15

VMP Mortgage Forms, Inc.

Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**

**(D) "Trustee"** is **Marin Conveyancing Corp.**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **November 30, 2006** .
The Note states that Borrower owes Lender **six hundred forty thousand and 00/100**

Dollars

(U.S. $ **640,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **December 1, 2036** .

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |
| [x] Occupancy Rider | [x] Interim Interest Rider | |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

6180

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|                County                | of |         San Mateo            | : |
| :----------------------------------: | :--: | :--------------------------: | :--: |
| [Type of Recording Jurisdiction] |    | [Name of Recording Jurisdiction] |    |

**As more particularly described in "Exhibit A", attached hereto and made a part hereof.**

Parcel ID Number: **035-102-330**                                        which currently has the address of

**1719 Kehoe Avenue**                                                                    [Street]

**San Mateo**                                            [City], California **94401**        [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

6180

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

6180

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right· shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood·zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

6180

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

6180

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

6180

 -6A(CA) (0207).01                    Page 8 of 15                    Form 3005  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

6180



to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

6180

 **-6A(CA)** (0207).01

Form 3006  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

6180



requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

6180

 -6A(CA) (0207).01                    Page 13 of 15                    Form 3005  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                  Karim Allan                    -Borrower

_____          _____ (Seal)
                                                                                 -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                              -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                              -Borrower

_____ (Seal)   _____ (Seal)
                          -Borrower                                              -Borrower

6180

-6A(CA) (0207).01                    Page 14 of 15                    Form 3005   1/01

State of California
County of Alameda

On 11/30/06 before me, Jason Park, A Notary Public

personally appeared

Karim Allan

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)



JASON PARK
COMM. # 1544041
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. JAN. 14, 2009

6180